493 So.2d 577 (1986)
C.W. DUNAWAY
v.
Alfred O. SPAIN.
No. 85-C-1235.
Supreme Court of Louisiana.
September 8, 1986.
Richard B. Nevils, Baton Rouge, for defendant-applicant.
Richard L. McGimsey, Baton Rouge, for plaintiff-respondent.
LEMMON,[*] Justice.
We granted certiorari to determine the validity of relator's defense of dation en paiement in this suit on a promissory note. We now set aside the decision of the intermediate court which rejected the defense, concluding (in essential agreement with the trial court) that the evidence established that the defendant gave and plaintiff received a thing (defendant's equity in a vacant lot consisting of the difference between the market value of the lot and the amount expended by plaintiff in acquiring the lot) in partial payment of a debt owed by defendant to plaintiff.
Defendant was in the business of constructing houses, operating through a solely owned corporation, Alco Construction, Inc. In May, 1978, Alco bought five lots, *578 financing the purchase through a bank loan. In connection with the transaction, Alco executed a collateral mortgage on the five lots in favor of the bank, and defendant personally endorsed the note.
Soon after this purchase, Alco began construction of three houses, one each on two of these lots and the third on a previously owned lot. Construction financing was obtained through three separate mortgages with the same bank, and defendant again personally endorsed the notes. Unfortunately Alco ran out of money before completing the three houses, and the bank would not increase the amount of the loans because of the poor real estate sales market caused by high interest rates.
Plaintiff's wife was Alco's exclusive real estate agent in listing and selling houses. At a luncheon arranged by her in March of 1979, plaintiff and defendant discussed the corporation's dilemma, and plaintiff agreed to pledge a certificate of deposit and to lend defendant the loan proceeds of $18,000 for completion of the construction. The parties contemplated that the houses would be completed and sold within ninety days and that plaintiff would be repaid from the profits on the sales, which in the past had been about $6,000 per house. That afternoon defendant personally executed a promissory note for the amount of the loan. One week later Alco executed an $18,000 mortgage on the three lots involved in the construction, but defendant did not personally endorse the mortgage note.
The three houses were soon completed, but the first house was not sold until November, 1979, and the other two remained unsold until October, 1980 and July, 1981. At each sale, plaintiff executed a partial release of his mortgage. However, the amount due on the bank's mortgage exceeded the sale price at each sale, and plaintiff did not receive any funds to apply to the notes held by him.
The principal dispute in this case involves Alco's sale to plaintiff of a vacant lot one month after the July, 1981 sale of the third house. In August, 1981, Alco's only asset was one of the five lots purchased in 1978. The balance on the bank's collateral mortgage originally secured by the five lots was $20,583.40. For reasons disputed at trial, Alco (through defendant) executed an act of cash sale of the remaining lot to plaintiff for $13,000, and plaintiff paid that amount to the bank toward defendant's indebtedness. The bank released the mortgage on the lot, but required defendant and his son to execute a renewal note in the amount of $7,583.40 (which was the balance due on the collateral mortgage after plaintiff's $13,000 payment).
Over the following weeks, plaintiff made several verbal and written requests for payment of the $18,000 note, but no payments were ever made. On September 23, 1981, plaintiff filed this action. Defendant died several days later of cancer after a lengthy illness.
Defendant's heirs denied the debt on two bases. First, they contended that Alco's execution of the mortgage on the three lots one week after the $18,000 loan was a novation of the original transaction in which defendant had executed an unsecured promissory note. They argued that the original promissory note was extinguished when plaintiff accepted Alco's subsequent note and mortgage for the same debt. Second, defendant's heirs contended that the cash sale of the last lot was intended to be a dation en paiement. They attempted to prove that Alco transferred to plaintiff the vacant lot, worth at least $22,000, in exchange for plaintiff's paying $13,000 toward the bank's mortgage balance on that lot and accepting the lot in remission of the principal and interest on the $18,000 loan.
The trial court rejected the novation defense, finding that defendant delivered Alco's mortgage on the three lots as additional security for the $18,000 loan and not as a replacement for defendant's personal note. The court also rejected the argument that the lot was given and received in payment of the entire debt. However, because plaintiff obviously benefitted by receiving a lot worth $22,000 for paying $13,000 toward Alco's debt, the court held that defendant *579 was due a credit for the difference, to be applied to defendant's overall indebtedness to plaintiff.
On appeal by both parties, the intermediate court in a two-to-one decision affirmed in part and reversed in part. 468 So.2d 771. The court agreed with the lower court's rejection of the affirmative defenses of novation and dation en paiement and affirmed the judgment in favor of plaintiff. However, the court disallowed the $9,000 credit, concluding that there was no authority for awarding an additional amount to the seller when the validity of the sale was not contested. We granted defendant's heirs' application for certiorari. 475 So.2d 346.
The lower courts correctly decided the novation issue. The record supports the trial judge's conclusion that the evidence failed to establish plaintiff's intention to release defendant from his personal obligation in exchange for Alco's execution of a mortgage on the three lots, especially in view of the absence of any language in the mortgage or note suggesting this intention and of defendant's failure to request the return of the personal note that Alco's note allegedly replaced.
The dation en paiement argument presents more difficult questions.[1] La.C.C. Art. 2655 defines a dation en paiement as follows:
"The giving in payment is an act by which a debtor gives a thing to the creditor, who is willing to receive it, in payment of a sum which is due."
The essence of the defense of dation en paiement in this case is the contention that defendant gave and plaintiff accepted a thing (defendant's equity in the lot) in payment of defendant's $18,000 debt. Pointing out that the lot was Alco's sole asset and that the debtors were an insolvent corporation and a terminally ill shareholder, defendant's heirs argue that the transfer of the lot at a price far below its market value constituted a dation en paiement of the entire debt.[2] The critical consideration in determining whether a transfer of property constituted a dation en paiement is the intent of the parties, particularly the creditor who has the right to demand exactly what was due by virtue of the obligation. 2 M. Planiol, Traité Élémentaire de Droit Civil § 522 (Louisiana State Law Institute trans. 1959).
Defendant's wife testified that plaintiff's wife had informed her that plaintiff would accept the transfer of the lot in settlement of the entire debt. After she discussed the matter with her husband, they executed the act of sale before plaintiff's notary.[3]
Plaintiff testified that he released the first two houses from his mortgage in hope of being paid from the proceeds of the third sale, after high interest rates had adversely affected real estate sales. When an agreement to purchase the third house was obtained, the bank's branch manager informed him that the bank would close the sale of the house only if he would take over the remaining lot and assume the $13,000 mortgage owed by the corporation. He asserted that the officer told him the bank would otherwise foreclose on the mortgage on the house and leave him holding an unsecured note. Since he knew that the lot was worth more than $13,000 and he hoped to get some money from the sale of the third house, he agreed to do so.[4] He *580 claimed that he never talked to defendant about the transfer of the lot.[5]
Plaintiff's wife's testimony was essentially the same as that of her husband, except that she asserted the bank officer told plaintiff that the bank would release the lot from the mortgage upon plaintiff's payment of $13,000 and that plaintiff could recover the money owed him from the proceeds of a resale of the lot in excess of $13,000.[6] She emphasized that "the whole idea was to get some money out of the sale of the lot". She further testified that she told defendant that her husband would have most of the money for satisfaction of the debt if the lot could be sold for about $25,000. She then put the lot on the market at $27,000 and later reduced the price to $25,000, but never received any written offers and only one verbal offer for $15,000.
The bank officer denied that the sale of the third house depended upon the sale of the remaining lot, which was under a separate mortgage.[7] He also denied contacting plaintiff or his wife about acquiring the lot by paying off part of the mortgage, noting that this would be divulging his customer's (defendant's) business without authorization.
There was thus a conflict in testimony between the partiesdefendant's wife testified that plaintiff and his wife suggested the transfer in exchange for cancellation of the $18,000 mortgage, while plaintiff and his wife testified that the bank's manager suggested the sale of the lot in order for the sale of the third house to be completed. The bank's manager denied the latter version. The trial judge expressly disbelieved that there was a "swap-off for the sale of [the third house] for the sale of [the vacant lot]", thus rejecting plaintiff's assertion that the bank made the house sale contingent upon the lot sale. Moreover, any threat by the bank to foreclose on the third house became meaningless when plaintiff agreed to release the house from his mortgage without receiving any of the sale proceeds.[8] Nevertheless, the judge found that the transfer was not "a cancellation of the debt or giving in payment in toto for that debt", observing that "more would have been done". (emphasis added) After reviewing the record, we conclude that the evidence clearly established at least a giving in partial payment, a conclusion which is consistent with the trial judge's award of a $9,000 credit.
Plaintiff and defendant clearly reached an agreement whereby defendant transferred the vacant lot for less than its market value, but defendant received absolutely no benefit if the transfer was a straight cash sale, as recited in the deed. Defendant's $20,583.40 debt to the bank, secured by a mortgage on the lot, was reduced by the $13,000 paid by plaintiff, but defendant and his son were required to sign a new note for the remaining debt of $7,583.40 when the bank released the lot from the mortgage.[9] Thus, the bank benefitted by collecting the full amount of its construction loan on the third house and $13,000 of the balance on the collateral mortgage without *581 having to foreclose on either mortgage; plaintiff benefitted by acquiring a lot at a price considerably lower than market value; yet defendant received absolutely no benefit for transferring his last corporate asset. The only apparent explanation for defendant's agreeing to the transfer was the corresponding agreement by plaintiff to extinguish or reduce defendant's debt.
The record warrants a conclusion that the parties reached an agreement to reduce the debt. Defendant's wife (especially in her deposition) testified that they reached an agreement with plaintiff and his wife for cancellation of the debt in exchange for the transfer.[10] Plaintiff's wife's testimony that she told defendant his debt would be reduced by any amount realized from a sale of the lot in excess of the $13,000 purchase price supported a conclusion that an agreement was reached for partial satisfaction of the debt. Plaintiff in his testimony did not deny that he agreed the proceeds of a resale of the lot in excess of $13,000 would be applied to the debt, even after his wife testified that such an agreement was reached. And the bank officer's testimony did not contradict defendant's wife's version, since he said he never discussed the transaction with any of the parties.
We therefore conclude that plaintiff and defendant agreed to give and receive the value of the lot in excess of the $13,000 sale price in partial payment of the debt which was due. Although we have not found any instances in the jurisprudence in which a thing was given to a creditor in partial payment of a debt, there is no logical reason why a debtor and creditor cannot legally agree to such a transaction. The trial judge, while not characterizing the transaction as a giving in partial payment of the debt, essentially achieved the same result by awarding defendant a credit in an amount determined to be the difference between the sale price and the market value of the lot.[11] The appellate court erred in reversing that part of the judgment.
Accordingly, the judgment of the court of appeal is set aside, and the judgment of the trial court is reinstated. Costs in the court of appeal and in this court are to be equally divided.
MARCUS, J., concurs and assigns reasons.
BLANCHE, J., concurs and will assign reasons.
MARCUS, Justice (concurring).
I agree that a $9,000 credit should be given on the debt owed to plaintiff based upon the majority's finding of an agreement between the parties to that effect. However, I do not consider the debtor's cash sale of his lot to the creditor to be a partial dation en paiement. Accordingly, I respectfully concur in the result.
NOTES
[*] Blanche, J., retired, participated in this case ad hoc in place of Cole, J., the matter having been heard and submitted before Justice Cole replaced Justice Blanche on the Court.
[1] Giving in payment is conceptually similar in some legal respects to novation. In novation two parties contract by a promise of giving something different in payment of a sum due, while in dation en paiement one party delivers and the other party accepts the thing in payment of the debt. See S. Litvinoff, 6 Louisiana Civil Law TreatiseObligations § 398 (1969). Delivery is essential to a giving in payment in Louisiana. La.C.C. Art. 2656.
[2] An expert real estate appraiser presented by defendant's heirs valued the lot at $22,000 at the time of the transfer. There was no other evidence of value in 1981.
[3] Since defendant died shortly after suit was filed, neither his testimony nor his deposition was available at trial.
[4] Plaintiff's claim that he paid the $13,000 and acquired the lot in order to avoid being left with an unsecured note after a foreclosure is illogical. In order for the sale of the third house to proceed without foreclosure, it was necessary for plaintiff to release the house from his mortgage, leaving the debt unsecured.
[5] Plaintiff and defendant signed the sale at different times. Defendant was in a weakened condition from his illness, and the notary went outside his office to defendant's car to obtain his signature.
[6] At the time of the lot sale, plaintiff and his wife were legally separated. They were divorced at time of trial.
[7] At the time of the construction financing for each house, the pertinent lot was released from the original collateral mortgage and made subject to a new construction loan.
[8] Because the third house remained unsold and subject to a construction loan for three years during a period of high interest rates, plaintiff could not reasonably have expected that any proceeds of the sale would be available in excess of the amount due on the construction loan.
[9] The bank collected this debt in full after defendant's death when his widow and children were forced to sell the family home, realizing only a small amount after the payment of several mortgages.
[10] Although defendant's wife testified at trial, her deposition was also introduced into evidence and was admitted for all purposes.
[11] If plaintiff had sold the lot for $22,000 shortly after he acquired it from defendant, the record in this suit on the $18,000 note would clearly support the affirmative defense to the extent of $9,000. Because the lot had not been sold, it was necessary for the trial court to quantify the credit in this suit to collect the debt.